Julius W. ERVING, Plaintiff,

v.

The VIRGINIA SQUIRES BASKETBALL CLUB, a limited partnership, Defendant.

Civ. A. No. 72 C 765.

United States District Court, E. D. New York.

Sept. 19, 1972.

Paul Martinson, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiff.

Clark J. Gurney, Roth, Carlson, Kwit, Spengler & Goodell, New York City (E. Leslie Cox, Breeden, Howard & MacMillan, Norfolk, Va., of counsel), for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiff, a professional basketball player, commenced this action to rescind his contract with the defendant basketball club (hereinafter "Squires") and to recover claimed damages of $308,800 by reason of alleged concealment and false representations which induced him to enter the contract. Jurisdiction is grounded on diversity of citizenship, 28 U.S.C. § 1332(a), plaintiff alleging New York citizenship and residence and Squires conceding it is a limited partnership having its principal office in Norfolk, Virginia where the sole general partner, a District of Columbia corporation, also resides and is licensed to do business.[1]

Squires has moved before answer to dismiss the complaint for lack of juris-diction over the subject matter and over its person and for insufficient service of process. Rule 12(b)(1), (2) and (5), F.R.Civ.P. Alternatively, it seeks to have the action transferred under 28 U.S.C. § 1404(a) to the United States District Court for the Eastern District of Virginia, Norfolk Division.

■ Squires' motion under Rule 12(b)(1) and (5) must fail. Its contention that the court lacks jurisdiction over the subject matter rests solely upon plaintiff's omission to allege in the complaint, as filed, the diverse citizenship of the Squires partnership as distinguished from its principal place of business in Virginia. For purposes of diversity jurisdiction the citizenship of the general partners is controlling. See Woodward v. D. H. Overmyer Co., 428 F.2d 880, 883 (2 Cir.), cert. den. 400 U.S. 993, 91 S.Ct. 460, 27 L.Ed.2d 441 (1971). The fact of such diverse citizenship having been documented by plaintiff and conceded by defendant, n. 1 *supra,* an amendment of the complaint was allowed so as to reflect it. Rule 15(a), F.R.Civ. P.

■ The claim of insufficiency of service of process also lacks merit. Concededly a copy of the summons and complaint was forwarded by the United States Marshal for this district to the Marshal for the Eastern District of Virginia. The latter's deputy delivered it to Al Bianchi, general manager of The Virginia Squires Basketball Club, Inc., the District of Columbia corporation which is the sole general partner of Squires. That service was effected at the general partner's office in Norfolk, Virginia, where the Squires business office is also located, n. 1 *supra,* and it is not denied that Mr. Bianchi was authorized to accept it.[2] The service was accomplished in conformity with New

---

1. Memorandum of Points and Authorities in Support of Motion to Dismiss, pp. 6-7; Affidavit of Earl M. Foreman, par. 1; Affidavit in Opposition of Paul Martinson, p. 2, Exh. 4.

2. Affidavit in Opposition of Paul Martinson, pp. 3-4.

York CPLR §§ 310, 311(1) and 313[3] as authorized by Rule 4(e) and (f), F.R. Civ.P., and is sufficient in all respects.

■■ The procedural sufficiency of service of process upon Squires having been upheld, the remaining—and critical—jurisdictional question is whether Squires is "subject to the jurisdiction of the courts of the state under section 301 or 302", N.Y. CPLR § 313, as plaintiff contends. On that question "it is the plaintiff who shoulders the burden of proof, by a preponderance of the evidence." Leasco Data Processing Equipment Corp. v. Maxwell, 319 F.Supp. 1256, 1260 (S.D.N.Y.1970). And "[a]s this is a diversity case the question must be resolved under New York law [citation omitted]." Beja v. Jahangiri, 453 F.2d 959, 960 (2 Cir. 1972).

■ Under N.Y. CPLR § 301,[4] as applied by the courts of New York, a nonresident "doing business" in New York may be sued here even though the plaintiff's cause of action does not arise out of acts done in New York. Beja v. Jahangiri, supra at 961, citing New York cases. "[T]here is no precise test of the nature or extent of the business that must be done" to subject a non-resident to such jurisdiction. Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 268, 115 N.E. 915, 918 (1917). "The test for 'doing business' is and should be a simple pragmatic one." Bryant v. Finnish National Airline, 15 N.Y.2d 426, 432, 260 N.Y.S.2d 625, 629, 208 N.E.2d 439, 441 (1965). "Each case necessarily depends on its own facts [citation omit-

ted]." Taca International Airlines v. Rolls-Royce of England, 21 A.D.2d 73, 74, 248 N.Y.S.2d 273, 275 (1st Dept. 1964), affd. 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965).

The following undisputed facts appear from the pleadings, affidavits and concessions of the parties concerning the unique business activities of defendant. Squires is engaged in the business of conducting and participating in professional basketball games for profit. Although Squires' domicile, base of operations and "home" games are localized in Norfolk, Virginia, its business is multistate and interstate in nature, as part of the operations of a national league of such clubs.

Squires is one of the member clubs of the American Basketball Association (ABA), which was formed "[t]o operate a league of professional basketball clubs and to promote the interests of professional basketball and the interests of each member club" and "[t]o do everything and anything . . . necessary . . . for the purposes above stated or any of them."[5] ABA was organized under the corporation law of Delaware but its principal office is and has been located in New York City where it is listed in the telephone directory, carries on its operations and acts "as the designated AGENT for the member clubs," supra n. 5.

ABA, under its by-laws, does not itself operate for profit, supra n. 5, but it is clearly the framework—akin to a joint venture—through which Squires

---

3. § 310. . . .
   Personal service upon persons conducting a business as a partnership may be made by personally serving the summons within the state upon any one of them.
   § 311. . . .
   Personal service upon a corporation . . . shall be made by delivering the summons as follows:
   1. upon any domestic or foreign corporation, to an officer, director, managing or general agent, . . .
   § 313. . . .
   A person domiciled in the state or subject to the jurisdiction of the courts of the state under section 301 or 302, or

his executor or administrator, may be served with the summons without the state, in the same manner as service is made within the state, by any person authorized to make service . . . by the laws of the state, territory, possession or country in which service is made . . . .

4. § 301. . . .
   A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore. L.1962, c. 308, eff. Sept. 1, 1963.

5. By-laws of American Basketball Association, Art. II, p. 2.

and the other member clubs carry on an integrated business operation for mutual profit. The ABA by-laws constitute a contract by and between the member clubs pursuant to which each club holds its franchise and conducts and participates in ABA basketball games in New York and other franchise areas. There is no question that ABA is jointly managed by the member clubs, although the day-to-day direction of its operations is vested in a Commissioner who is granted broad powers to regulate, supervise and enforce the obligations of the member clubs to one another.[6]

A review of ABA's comprehensive by-laws permits of no doubt that the playing of basketball games in New York is not only in furtherance of Squires' own business purposes but is essential to the fulfillment of the business purposes and objects of the ABA joint enterprise of which Squires is an integral part. Squires plays a number of games here with the New York Nets club of the ABA because it is contractually bound to do so. The playing dates and number of games are fixed months in advance by the ABA Commissioner who prepares the schedule of games each member club is obliged to play.[7]

That the Squires play only 6 to 8 games in New York out of a season schedule of 84 games cannot obscure the vital importance of the New York portion of the schedule to the Squires' continuance in business. The entire basketball season lasts only six months—October through March—except for play-off games; and the average number of playing days is about three a week. Thus during a season the Squires play in New York on the average of at least once a month, not casually or fortuitously, but on a regular and continuing basis pursuant to a well-organized business plan.

The Squires argue, however, that they derive no revenue from their games here since "all gate receipts go . . . to the New York Nets."[8] Even if altogether true, this would not alter the business character of the Squires' activities in New York. The distribution of game receipts is a matter of contract between all member clubs subject to change at each annual meeting.[9] And the end result currently is that when the Nets (or other clubs) play the Squires in Virginia all the gate receipts go to the Squires. Moreover, this policy does not hold for play-off games which the Squires and Nets played in New York last season as leaders of their respective ABA divisions. Under the by-laws the net receipts of such games are equally divided between the participating clubs after deducting expenses.[10] In addition, since play-off and championship games inevitably generate radio and television income, the ABA by-laws provide that contracts with the networks shall be negotiated by ABA (or designated agent) for the benefit of the member clubs, receipts to be held by the ABA treasurer for eventual distribution to the clubs equally.[11]

Regardless of the manner in which the Squires receive business income from their playing activities in New York, it is not denied that management and other personnel travel regularly to New York in connection with the performance of those activities. In addition to players, these include the Squires' executive vice-president, Mr. John Kerr, its head coach, Mr. Bianchi,

---

6. Each club elects one trustee to a board of trustees. *Id.*, Art. III, § 1(A) p. 3. The trustees, in turn, elect the Commissioner, who sits on the board as a trustee-at-large, and other officers. *Id.*, Art. III, § 2(A), p. 3. The Commissioner functions as a chief executive officer and under the by-laws the ABA office over which he presides "shall be a year-round full-time office", having such staff as he requires and under his "exclusive control and direction." *Id.*, Art. IV, § 20, p. 11.

7. *Id.*, Art. IV, § 23. p. 11.

8. Affidavit of Earl M. Foreman, p. 2.

9. By-laws of American Basketball Association, Art. XVIII, § 1, p. 41.

10. *Id.*, Art. XX, § 3, p. 43.

11. *Id.*, Art. XXII, § 1, p. 46.

and a trainer. Each game requires one overnight stay in New York; play-off games have required several nights' stay. All such arrangements are generally made by the head coach and obviously entail business dealings and communications with hotels, transportation companies and others in New York. Furthermore, the president of the Squires' corporate general partner, Mr. Earl M. Foreman, concedes that he has visited New York 18 to 20 times in the past three years. Mr. Foreman is a member of the ABA board of trustees and his most recent visit to New York mentioned in the record occurred on June 13, 1972 when the member clubs convened for the ABA annual meeting.

■ This is not the first time a court has had to take into account the unique nature of the business of professional basketball clubs in deciding whether or not their game-playing activities away from "home" render them subject to suit in those jurisdictions in which they play. In Hawkins v. National Basketball Association, 288 F.Supp. 614 (W.D.Pa.1968), a basketball player's civil antitrust action, the defendant association (NBA) and member clubs sought to dismiss the case for lack of proper venue. All the NBA member clubs except the Philadelphia 76ers were non-residents having no place of business in Pennsylvania or in Pittsburgh where the suit was brought. The applicable venue statute, 15 U.S.C. § 22, permitted suit "in any district wherein [a defendant] may be found or *transacts business*" (emphasis supplied).[12]

In denying dismissal upon the ground that the defendant member clubs had at various times played league games in Pittsburgh, the court observed, 288 F. Supp. at 619:

> The only business a corporation-owned professional athletic league

team could engage in profitably is to systematically play games with other member teams according to Association schedules and play exhibition games in metropolitan cities. From this revenue-producing business, of necessity they enter into contracts for transportation, board, lodging and miscellaneous items with persons in those cities.

> To say that these corporations transacted no business of any substantial character in this district would be to disregard the practical non-technical business standards applicable to professional athletic teams. The Association schedules were systematic and continuous during the seasons of 1963 through 1966.

With specific reference to the unusual nature of the defendants' business, the court's further comment is particularly apposite here, *id.*:

> We are of the opinion that the corporate members of this professional athletic venture are not to be governed by rules evolved with reference to manufacturing or selling, nor by "atomizing" or "pulverizing" their activities into minute parts or events in disregard of the actual unity and continuity of their whole course of conduct.

■ In this court's opinion Squires' business activities in New York as summarized above amply satisfy the plaintiff's burden of establishing that defendant is "doing business" here within the meaning of N.Y. CPLR § 301 so as to subject it to personal service of process under § 313. Applying the "simple pragmatic" test as instructed by Bryant v. Finnish National Airline, *supra* at pp. 629, 441, the facts sum up to show (1) regular and continuous, albeit periodic, visits to New York for the business purpose of playing professional games for

---

12. Although 15 U.S.C. § 22 is a venue statute, the term "transacts business" is construed to require proof that "in fact, in the ordinary and usual sense", a non-resident defendant does transact business of a "substantial character" in a particular

district before it may be required to defend a suit brought in that district. Eastman Kodak Company of New York v. Southern Photo Materials Company, 273 U.S. 359, 373, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

profit with the New York member club pursuant to an obligatory seasonal schedule; (2) regular and continuous visits of defendant's officials and employees to New York and dealings with New York business concerns—hotels, transportation companies, etc.—in furtherance of the execution of the business purpose in New York; and (3) participation in the management and revenues of the joint business enterprise, the ABA, headquartered in New York. Such activities can only be regarded as continuous and substantial business operations which fully satisfy the practical and liberal conception of "doing business" applied by the New York courts in determining the reach of jurisdiction under CPLR § 301. See Beja v. Jahangiri, *supra,* 453 F.2d at 961–962.

The conclusion with respect to § 301 jurisdiction over Squires makes it unnecessary to consider the applicability of § 302. Squires' request for alternative relief, if jurisdiction is found, requires a determination as to whether or not a transfer of this action to the Eastern District of Virginia under 28 U.S.C. § 1404(a) is warranted.

▆▆▆ A motion to transfer under § 1404(a) is addressed to the sound discretion of the court. United States v. General Motors Corp., 183 F.Supp. 858, 860 (S.D.N.Y.1960). In exercising its discretion, the court will ordinarily give great weight to plaintiff's choice of forum, and will look to the defendant to provide cogent reasons why transfer would be appropriate. "Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to

prove equally convenient or inconvenient." Van Dusen v. Barrack, 376 U.S. 612, 645, 84 S.Ct. 805, 824, 11 L.Ed.2d 945 (1963). In sum, Squires, the moving party, has "the burden of showing that the transfer is warranted, and unless the balance of conveniences clearly favors the [defendant], [plaintiff's] choice of forum will not be disturbed. [citations omitted]." Maheu v. Reynolds & Co., 282 F.Supp. 423, 426–427 (S.D.N.Y.1967).

▆▆▆ Squires urges that transfer should be ordered primarily on three grounds—the convenience of the parties, that of the witnesses, and the greater familiarity of Virginia courts with Virginia contract law. The facts disclosed in the papers before the court reveal no clear-cut imbalance of the equities for these or any other reasons.

(a) The convenience of the parties. Plaintiff's affidavits show that he is a resident and domiciliary of New York, that he owns a home here in which his family resides and which he claims as his own permanent residence. A copy of the contract between plaintiff and Squires, the subject of the controversy, describes plaintiff as being of "New York." [13] Squires, whose operations are admittedly based in Virginia, in view of the frequent visits to New York of its players, management and other employees hereinabove described, cannot seriously assert significantly greater inconvenience in being before this court than the inconvenience incident to any legal action instituted in a forum not of its own choosing.

13. Squires does not contest the facts that plaintiff grew up in Roosevelt, Long Island, attended local schools and owns a home there occupied by his dependent parents and himself. It does question his claim to "residence" in New York because (1) an employee's income tax withholding exemption certificate he signed reflects his residence as Virginia Beach, Virginia during the 1971–1972 training and regular basketball season (affidavit of Earl M. Foreman, Exhibit B); and (2) several newspaper reports indicate he had taken up residence in Atlanta, Georgia (Reply Affidavit of Earl M. Foreman, par. 4). This merely shows that plaintiff may have more than one residence as required by the demands of his profession and does not negate his continuing New York residence. Nor does it affect the relative convenience of the forum.

(b) The convenience of witnesses. The principal issues in this case involve the validity of the contract and pre-contract negotiations. Thus, the key witnesses at trial will probably be the six individuals who, according to Squires, participated in the negotiations. Plaintiff, as noted, is a New York resident. Mr. Foreman maintains a residence in Norfolk, Virginia. John Kerr, who also acted on behalf of Squires, resides in Virginia Beach, Virginia. Rene La Bel, a secretary to Mr. Foreman, is a resident of Chevy Chase, Maryland. R. Steven Arnold is from Corta Madera, California. Robert G. Woolf, whom Squires alleges to have acted as plaintiff's attorney, is from Allston, Massachusetts. Thus, although three of the witnesses are closer to the proposed transferee forum, two witnesses are closer to this court, and one witness is equally distant from both forums.

It does not appear that sources of proof other than the testimony of the parties and witnesses will be significant in this case. It is unlikely that a trial will involve the examination or delivery of vast numbers of documents or records. Consequently the relative ease of access to sources of proof is not critical. Even if it were, an imbalance in ease of access has not been shown.

(c) The applicable law. The contract was negotiated and executed in Philadelphia, Pennsylvania, but by its terms is to be governed by the laws of Virginia. Virginia law does not necessarily apply, however, since plaintiff's action is not a suit *on* the contract, but rather seeks to void it. It is equally likely, if not more likely, that Pennsylvania law is the applicable law, in which case this forum would be as qualified as one in Virginia to decide this case.

None of the factors discussed above, nor any other practical considerations, warrant transferring this matter. The Eastern District of Virginia is not distinctly more convenient than the Eastern District of New York.

Accordingly, Squires' motion is denied in all respects and it is so ordered.